Good morning, may I please the court. My name is Robert Carlin. I appear on behalf of Paul Zapata, the appellant. Mr. Zapata's trial was fundamentally unfair as a result, Your Honours, of prosecutorial misconduct. And to the extent that the State Court recognized that the prosecutor had committed serious misconduct, I would respectfully submit that the sole inquiry at this stage is whether or not that misconduct infected Mr. Zapata's trial with unfairness. And the most obvious instance of misconduct, the instance that the State Court deemed serious, was the prosecutor's rebuttal argument wherein the prosecutor focused on a fictional account of what the victim in the case must have thought or heard in his last moments. And it's that summation, that argument, that we believe constituted an attempt on the prosecutor's part, if you will, to deflect the jury's focus from its core goal at trial, which was to evaluate the guilt or the innocence of Mr. Zapata, and invited the jury to convict Mr. Zapata for the wrong reasons, if you will. I believe that the cases that we have cited that deal with the issue of improper summation, most obviously Darden and Drayton, wherein convictions were deemed safe, don't apply to this case, to Mr. Zapata's case, because none of the criteria that the corpse in those cases stated as, if you will, the criteria that saved the convictions, are applicable in Mr. Zapata's case. Can I ask a question? For myself, at least, the part of all of this that I found most disturbing was the closing argument in which statements were made about epithets that might have been said, but there was no evidence were said, to the victim as he was being killed. Was that said more than once? Yes, Your Honor. I believe, and Your Honor has pointed out, I believe, to the most obviously serious and most egregious instance of the prosecutor's misconduct. The prosecutor, and if I may, I apologize in advance for the repetition of the term, but I believe the term is so offensive that I need to pause. That's okay. He said scrap, and he said wetback. Well, he used the epithet, he used the word, and I quote, fucking scrap, wetback, and that term was used on three occasions during the rebuttal argument, the prosecutor's summation. He's projecting what the victim. Projecting, Your Honor, and I'm. Let me finish. Yes, Your Honor, I apologize. He was projecting a what he portrayed for the jury in rebuttal as the last moments of the victim's life, and he was putting words in the Mr. Zapata's mouth. Correct. As he was saying these words. Correct. And he said it, I thought there were two, but you're saying three times. Well, I think what the prosecutor did was on three occasions he used the term scrap and wetback. In an additional three occasions, the prosecutor made reference to a prior incident which involved Mr. Zapata and associates of his wherein he and the associates attacked a, what appears to have been possibly a family, but a 53-, 54-year-old woman, a young woman in her early 20s, a young man in his late teens, and a 14-year-old blind boy. And it is said that during that attack, Your Honor, these very same words, scrap and wetback, were used. So, in fact, there are six instances of the repetition of these terms. Wait a minute. Are you saying that in the other incident there is evidence in the record that Mr. Zapata actually did use those terms? There is evidence that somebody in a group that included Mr. Zapata is said to have used those terms. But I believe that the problem with the whole constant repetition of these words is that... Well, now, wait a minute, counsel. There's one thing for him to make up a fiction and invent these words that might have been used. It's another thing if he is extrapolating, whether it decides the issue or not, but the context is different. If he is extrapolating from words that were used, allegedly used by Mr. Zapata, in another event where witnesses have testified that he used those words, that puts a whole different color on it, doesn't it? Well, if anything, Your Honor, I think it heightens the problem with the summation because it invites the jury to, if you will, and the incident in question occurred after the shooting, but it invites the jury to assume that if Mr. Zapata does this once, he'll do it again, and... I understand the analysis is different, though, if he just picked those words out of the air, and you're saying that there was evidence that he had used those words on another occasion. Those words had been used by someone in a group. Someone. Someone in a group. Correct. Okay. But the point, if you will, of the repetition of those words, I believe, is, is because, if you will, the prosecutor is, I think by design, intentionally bringing the jury's attention back. But that's a different problem, as Judge Fischer said. Is your claim that this was inflammatory and he shouldn't have been saying it because it was inflammatory, or was your claim that he just made it up? He made up something that wasn't in the record. Well, I think it's both. The use of the language at the shooting is completely fabricated. There's no... Well, he does say, he says, he does use the word inference. He says, what's the reasonable inference of what was going on at that precise moment? And then he says, fucking scrap and fucking wetback. And then later on, I guess in the same sequence, he says, to just try and get home and lead his life, fucking scrap wetback. And you say he said it one more time, and I don't know where that is. But he does say inference. So the question is, and you say now, which I didn't know either, I didn't, that these words were said by someone in the context of an attack when Zapata was there, right? Correct. But I would respectfully submit that it's not a reasonable inference. There's no evidence in the record that suggests that this attack was motivated by any racial animus. There's no evidence in the record remotely that it was. Well, the only inference that one can make about the motivation was that it was because he was in, they thought he was in a gang, even though it appears he wasn't. That's assumed. I'm sorry? That is assumed. Right. But it's not a fact. But there's no evidence with respect to what was or was not said. It's clearly and utterly a fabrication, and it is not only a fabrication, but it's inflammatory. There's no reason to believe. Well, if there were direct evidence that he said that, there would be no problem using that in the closing argument, would there? It would have been inflammatory because it was true. But that's correct. And I believe, Your Honor, that's one of the factors that Drayden addresses, is despite the egregious summation in the Drayden case, one of the saving factors, if you will, one of three saving factors in Drayden, and the most critical of the, if you will, redemptive factors in Drayden, was that the prosecutor's argument was supported by evidence and reasonable inferences, and the court went on to say that had the prosecutor made the argument in the third person, then the argument would have been tolerable. The summation in this particular case was not, with respect, predicated upon reasonable inferences. It was a pure fabrication. And I think to the extent that it invited the jury to continually go back to this other incident, which would admittedly shock most people and offend most people, it was incendiary beyond inflammatory because I believe that the jury were constantly reminded that Mr. Zapata had been involved in an attack on a 14-year-old client. But if that incident was properly admitted and there's no claim here that it wasn't, then they were entitled to rely on it. Fairly. And what the prosecutor is not entitled to do, and what I believe he was inferentially doing, is to say to the jury, well, you may as well convict Mr. Zapata because this is the kind of fellow that attacks Mexican nationals during which he pulls them scraps and wetbacks. So the ---- Well, the California Court of Appeal found it to be misconduct, did it not? Your Honor is correct. Yes. So it was also argued in the case as an ineffective assistance of counsel claim. So what got certified to us was which? Are you arguing both IAC and prosecutor? Well, I believe, if you will, that with respect to that particular issue, I think both are present. I think the failure to object to that summation. I think the other thing, Your Honor, if I may, with respect to the argument is the timing of the argument. Yes, it's in rebuttal, so you never get a chance. You don't get a chance. Yes. I've been sandbagged like that myself, so I understand. But the question I'm trying to sort out here is you want us to decide this case on prosecutorial misconduct. Well, I think ---- The Court of Appeal found misconduct. It then went on to say, nonetheless, it wasn't ultimately prejudicial. So could you address that aspect? Correct. And to very quickly respond to the other portion of Your Honor's question, I believe that the failure to object was also below the reasonable standard expected and required by strip them. But with respect to the appeal court's determination on the facts, I would respectfully submit that the state court's determination that there was no prejudice was an unreasonable determination of the facts in the record. And with respect to whether or not the verdict was based on the evidence and or credibility of witnesses, I think is seriously in question, because I think that the determination of witness credibility and evidence would have been significantly different, but for the inadmissible evidence that we've referred to in our brief, the prosecutor's shifting of the burden, the suggestion, for example, that it was Mr. Zapata's burden to create a reasonable doubt as opposed to the prosecutor's constitutional obligation to eliminate a reasonable doubt. The Griffin error and this improper argument, all of those in combination, cumulatively cloud the verdict and, I think, throw significant doubt as to whether or not the jury actually reached its verdict based on a credible determination of the facts. I think... Well, ultimately, what the California Court of Appeals said, and I would like your assistance, that the record does not affirmly suggest any tactical reason, but it's nonetheless conceivable that counsel has such a reason. We are simply unable to say on this cold record that there could be no conceivable tactical reason for the latter's acquiescence. Is that the legal standard that we apply? And, Your Honor, Your Honor is referring to the failure to object to the improper argument. I'm sorry? Yes. No. I think that the determination that the State court made with respect to there being a potential tactical reason, apart from the fact that the State court may have been inviting State habeas review, I think that there is no doubt that there was no, not possibly, a reasonable tactical purpose for the State to object. They don't give one. They don't suggest one. No, they don't. If you will, it's kind of, it seems that there's a pregnant pause. But I believe, Your Honor, that there is not any reasonable tactical justification for the failure to object in that instance. And clearly, the label of trial strategy does and cannot and should not immunize defense counsel from Sixth Amendment scrutiny. And I think that the case that, one of the cases that presided in our brief, Baldwin, which is a district court case that nonetheless cites to a Ninth Circuit habeas case, makes clear that this failure to object was clearly an egregious example of defense counsel's deficiencies. It's not a reasonable trial strategy. And I could cite, Baldwin has cited, and we cite Baldwin, and Baldwin in turn cites Ms. Lardin, M-U-S-L-A-D-I-N, 555 F-2nd 830, 845-6. In similar instance, those courts found that the failure to object at so critical a stage is inexcusable and falls below the Strickland standard. Can you tell me once again? I know you answered the question, but I'm not sure I heard the answer. Whether the prosecutorial discretion on this contact question as to the closing argument is directly before us or only before us on ineffective assistance? I think both, Your Honor. I think both, because the State court The California court of appeal addressed They addressed both in their summary. They, as I believe was pointed out from the bench, there was the observation that there could have been a reasonable trial tactic that justified failure to object. Well, that's the ineffective assistance. That's the IAC and the prosecutorial discretion. But it wouldn't matter about whether there was a reasonable trial tactic if the question was directly before the California court of appeals and directly before us. That's what I'm asking. The California court of appeals did address the issue of prosecutorial discretion. Then why did they get into the question of the ineffective assistance possible tactic? I'm sorry, Your Honor. Then why did they get into the question of whether there was a possible tactic? I think that was just a corollary to the prosecutorial misconduct analysis. But as I say, Your Honor, I don't believe that there was a reasonable tactic. And I think, as I stated before, the timing and the lack of objection, and therefore the lack of any kind of curative instruction whatsoever, also distinguishes this case from Drayden and Darden, where there were instructions, there were reasonable inferences. And I think, secondly, or thirdly, excuse me, the strength of the evidence in both those cases. Well, actually, what the court of appeals actually said was due to counsel's failure to object to these remarks, the claim of prosecutorial error as such is not available on appeal. It would be nice if you told us that. I think they addressed. I just read you what they said. Due to counsel's failure to object to these remarks, however, the claim of prosecutorial error as such is not available on appeal. But they proceeded to address it. Well, they addressed it first as part of an ineffective claim. But they said specifically they weren't doing it. Well, I think once they've addressed it on the merits and not invoked any kind of procedural Well, that's just not true. If they're telling us that it was procedurally defaulted, which they did. I beg your pardon? They tell us that it was procedurally defaulted as a matter of State law. But they did not they continued, if you will, to discuss the issue, and by discussing it on the merits, they appear to have. I don't believe the issue is waived. It specifically said they weren't addressing it on the merits. All right. Well, I'm a little taken aback because it seems fairly clear what they were doing. Thank you. Again, I think that Thomas and Hubbard deals with, in the case that we've cited, as to why we don't believe it's procedurally barred. They did not, as they had in the case that the State. Do you know whether it was raised as a separate point to the Court of Appeal? Were there two points raised, one of prosecutorial misconduct and two of ineffective assistance? I can't answer that question for you, Your Honor. We'll have to determine that from the record. I know. I apologize. All right. Thank you. Your time is over. Thank you, Your Honor. May it please the Court, John Dice for Respondent. I'll continue with this issue, if that's the preference of the Court. Yes. Maybe you can tell us first, if you know, was the two issues raised before the case, one prosecutorial misconduct and two failure to object to the prosecutorial misconduct? Your Honor, my recollection is that the claim was raised in the Court of Appeal as prosecutorial misconduct. In the California Supreme Court, the claim was phrased as ineffective assistance of counsel based on the failure to object.  Now, I think Judge Berzon correctly points out at page 37 of the Court of Appeal opinion, what the Court of Appeal is doing is saying there was no objection to these comments, therefore, the claim is waived or forfeited. And the way the Court goes on to address it is clearly an ineffective assistance of counsel claim. They're finding that the defense attorney might have had a reason. The Court could not figure a reason, but the Court said the defense attorney   might have had a reason. So is that the right standard? There could conceivably be a reason. We can't think of one, you can't think of one, I can't think of one, but there's a conceivable reason. Is that the standard? Well, I think there are very clear reasons for why the defense attorney sat silent, because I believe the evidence shows that this was a very clear inference. I think what the process was. Was it an inference that he said those words? I'm sorry, Judge. He said those words at that moment when he was standing there with a gun to somebody he'd never seen in his life, and he said that? But at page 8 of the Court of Appeal opinion, the Court of Appeal notes there was evidence at trial when a police expert testified to the defendant's prior crimes. The expert brought in many instances of terrible things that the defendant and his OSP gang member friends did. And in particular he used specific words. The first time he said it was an inference, but the second two times he used those words, he just used them as if they'd been said. And there's just nothing in the record to suggest those words were said. But, Judge, I think there is. Let's think of the circumstances. First of all, the victim. You think what the prosecutor did here was appropriate? Proper? Judge, I'm sorry. I didn't mean to. You think what the prosecutor did here was proper? I think it was improper when he... No, proper is your view. I think his reference to the final words, it's borderline, Your Honor. Well, but the California Court of Appeal said emphatically and with some passion that it was totally wrong. You're right. But I think the focus of the Court of Appeal was on the appeal to the emotions of the jurors. And I agree. A prosecutor should not appeal to the emotions of the jurors. But I disagree. I can't spend too much time disagreeing with the Court of Appeal because they reached that finding. But I would like to discuss it because I really think what the Court of Appeal was most offended by was the fact that the prosecutor was tugging at the heartstrings of the jurors, which is wrong. We all know it's wrong. But was it really an unfair inference to talk about what might have happened? Because in this case, the victim was not from that... He didn't say what might have happened. Judge... He didn't say what might have happened. He didn't say to the jury he might have said this. No. This is the last thing that the man heard before he died. Imagine what it was like to hear this fact, these words, which we have no idea were ever said. That's right. But, Your Honor, let's take the facts of the case. The victim was not from the area. His car broke down. He's talking on the phone at 2 a.m. to his girlfriend. We had to do what with the fact that the prosecutor lied? But I don't think it was a lie. You don't think it's a lie when he said these were the last words he heard? I think when he earlier said it's a reasonable inference. And what on earth could the defendant have had as a motivation? He walked up to the victim who's talking... Well, you have to say what his motivation is. That's a different question. That's the problem here. It's one thing to say he was motivated by hate, and that's a fair inference. But it's another, whether it's a hate of a gang or a hate of an ethnicity. But the fact that he said certain words is just nowhere. I mean, there's no evidence of it. But, Judge, at page 8 of the court of appeal opinion, in a prior case, the defendant and his buddies attacked a Mexican family and yelled and... While this chain of inferences could furnish some... They basically said what I just said, which I didn't really realize. While this chain of inferences could furnish a motive for the shooting, an element such as intent and premeditation, it was pure fiction to suppose that an awful establishment was actually being said at the time of the shooting. That's what the California court of appeals said. And they're right. Well, you can say it's not a lie. It's just pure fiction, if that makes you happier. Well, but, Judge... I mean, you know, I won't tell you what I think of that prosecutor or what should be done about a prosecutor who tells a jury remote fiction when asking them to imagine the last thoughts of a murder victim and tells them pure fiction. You know, if I were you, I would be arguing that he should be convicted anyway that is non-prejudicial. But I wouldn't try to justify a prosecutor who goes to a jury and says, imagine these terrible things that are pure fiction, the last things that happened to this murder victim. You want to spend your time justifying that kind of a prosecutor, go ahead. But as far as I'm concerned, the issue is, is that prejudicial and does it render the trial unfair? Okay. I'll just very quickly say the shooting was inconceivable. The man was on the telephone, and all of a sudden the defendant appeared and was yelling and screaming and shot him twice. But the evidence is kind of a mess, actually. Your Honor, if I may summarize the strength of the evidence, because in my brief at pages 20 and 21, I summarized the court of appeals' harmless error analysis, and I supplemented that with a footnote. But the statement of facts and my final argument also give additional facts that I think make this a strong case. First, the eyewitness to the shooting saw the shooter from a distance of about 40 feet. He looked at the shooter for a full two seconds, straight in the face, one, two, probably the distance from the rail to the bench. His headlights were on the shooter. The eyewitness described the shooter to a police detective. But he didn't identify him. Pardon me? He did not identify him in court or anywhere else. He did not identify him. You're right. Right. But he described the shooter to a police sketch artist. Where, by the way, in the record is the sketch artist pictures? I'm sorry? Where are the sketch artist pictures? I couldn't find them. Judge, they were not in the State court record on appeal. But what happened, they were trial exhibits. And the court of appeal pulled up the trial exhibits and looked at them. I happen to have obtained them. I thought the Court might be a little curious. They were not in the record on appeal. We did not augment the record on appeal. Is it in our record, in the district court record? Is it in the district court? It was not in the district court record either. And I think the key reason, I do have the exhibits if the Court would like to see them, but I think the key point is this. The eyewitness described the shooter, 20 to 25-year-old Hispanic male, stocky with a goatee and a necklace. And so the sketch artist drew that picture. And then that photo was shown to the defendant's former girlfriend. And when she saw it, she laughed out loud and said that looks exactly like Paul. He did not say it looked exactly like him, but she did laugh out loud. Okay. Well, but she clearly recognized the defendant. I thought she said that looks exactly like Paul when he was trying to grow a goatee. And it was that testimony that was very significant. And I think that the evidence at trial about the height and weight of the shooter, a stocky Hispanic male. And Your Honor, a fair number of stocky Hispanic males at the same time. Well, but I will, if the Court would like to see the sketch, again, I could manage to bring it into the record. Then you have to. I mean, the main two other witnesses are two other people who obviously have major problems with this guy for good reasons. The woman who was either beaten up or her husband was or her boyfriend was beaten up or something, and the girlfriend doesn't like him anymore either. So it's kind of, I mean, it's not, it's sufficient, but it's not terrific. But Your Honor, let's think about it. First, as I've said, the shooting was absolutely inexplicable other than a gang shooting. The victim was wearing that horrible jersey with the number 8 on it, and the police sketch, or the police expert said that 8 on his jersey would have made him a marked man to OSP gang members. And it was clear the defendant was an OSP gang member. Nancy Echeverria, his former girlfriend, said that the defendant had been at a barbecue in the neighborhood of the 7-Eleven on the night of the shooting. He had been with other OSP members at the time. She said that his clothing at the barbecue matched the clothing of the shooter, as reported in newspaper accounts after the shooting. So there's more evidence there. Let me ask a question. Did she say that at the trial or at some other earlier juncture? That came out through the prior statement that was in a prior statement to the Detective Zenn, and that did come out at trial. Furthermore, the truck, there were three eyewitnesses who said that there was a white truck associated with the shooter. The defendant had a white Toyota truck. Now, there was some question. One witness said it might have been a Ford. He wasn't sure. He thought it was a Ford. I thought he said it was definitely a Ford, because I've looked at cars for 25 years, and I know for sure it was a Ford. Your Honor, I think if you look at his testimony, he believed it was a Ford. But in any event, the Army recruiter who was with him went outside, and he saw the truck speeding away. He said it was a white pickup with a chrome bumper, and I saw blue letters Toyota on the back of it. And he said that truck crashed into a traffic island, and so it should have damage to its right tires. And when he saw the truck at the police yard shortly before trial, sure enough, the defendant's truck had damage to its right tires. Was it the tire or the wheel itself? I'm not sure. There was damage. I talk about tire or wheel, but there was no dispute that either the wheel... Wasn't that years later, though? It was, but still... Still had the same damage, years later? Well, apparently so. But the defendant's friends, Anthony Villalobos, was talking with... The gang who was in jail, they were talking in January 2003 about that white truck that we've got to get rid of. Strange conversation, and on cross-examination, Mr. Villalobos admitted, yeah, maybe I was talking about the defendant, and maybe I was talking about the defendant's truck. Getting rid of the defendant's truck. So this... Sheriff Sanchez said that he shot up someone at the 7-Eleven. The court of appeal records that somewhat differently. He shot up the 7-Eleven. That sounds like shooting up the building. Well, I think... I'm certainly not aware of any other shooting than the murder of this victim at the 7-Eleven. And the defendant said to Sheriff Sanchez, I've got to get rid of my truck because I shot up the 7-Eleven. No, that's not what she testified. She testified he said shot up someone. It was the court of appeal who made it in to shot up the 7-Eleven. Well, I'm not sure... It seems to me it's more damaging to Zapata than your suggestion, but that's my reading of the testimony. If that's the right testimony. Judge, my recollection, all I really focused on was... The question to the prosecutor was, he tells you while he's a few inches away from your ear, he says he shot up someone at 7-Eleven. Answer, uh-huh, yes. Okay. That's Sanchez. That's her testimony. Okay. Right? Right. So it wasn't shooting up the 7-Eleven, she saw, she actually testified that he shot up someone. Okay, I mean... He didn't fire shots into the 7-Eleven, he shot someone at. Well, thank you. Well, I'm just trying to get the record straight because the court of appeal analyzed it as if it were more general. I see. Well, to me the very damning reference, once there was testimony that he admitted shooting either someone or at the 7-Eleven, that was a very damaging admission. Especially in light of the evidence as a whole. And again, there really is little doubt, I think, this must have been a gang shooting because there was absolutely no other explanation for it. And these gang members had a history of going out and intimidating people in the neighborhoods. And when they did so, they would shout out racial epithets, specifically scrapas and wetbacks. And so I guess I'm coming back somewhat to the other point. I do think that the harmless error analysis at the end of the day prevails. And I do acknowledge that the prosecutor should not have appealed to the emotions of the jurors. That's where the court of appeal... He also shouldn't have lied to them. Well, Your Honor, I don't think... Your time is up. I don't think he was lying to the jurors. Your time is up. Thank you, Judge. Thank you. We'll give you two minutes for rebuttal. I think... You may have two minutes for rebuttal if you would like. Thank you, Your Honor. I appreciate that. I'd like just to respond to a couple of the factual observations that my colleague made and then sum up our position, if you will. With respect to the evidence, I think there were clearly flaws in the evidence, which is perhaps why the prosecutor... Well, the question is, to focus where we are now, was there direct or was the evidence sufficient to meet the direct standard if we assume that and agree with the California Court of Appeals that there was a prosecutorial error and if we disagreed on the IAC, what about the harmless error of Brett question? I believe that the evidence was not sufficient. The counsel... You don't mean not sufficient. You're talking about Brett. Correct. I think that counsel referred to the eyewitness. We've really only had one eyewitness. And, in fact, what the eyewitness told... One of the other people who saw a white truck. A lot of people saw what appeared to be a white truck or a white vehicle. There was significant discrepancy between the eyewitness accounts as to what that vehicle was. Your Honor has noted that Mr. Moulton was adamant that it was a Ford, Mr. Davila that it was a Toyota. Mr. Davila saw the truck... It was a Toyota. I beg your pardon, Your Honor? It was a Toyota. Apparently so. Yes. And it had damage to the wheels. There's no significant description of what that damage was three years after the fact. And most people will scuff a curb over the course of three years. I think it's telling... There was somebody, some person who said that he told her that he shot somebody at the seminal limit. I believe that there are serious issues with respect to Ms. Sanchez's credibility that I don't have time to get into. She had a reason to dislike Zapata because he beat up her. Clearly. She was also a very close friend with his ex-girlfriend, Ms. Echevarria, with whom she spoke after the home invasion precipitated Ms. Sanchez's contact with the police. It was only a month after that, which also happened to be three months after Ms. Echevarria had broken up with Mr. Zapata finally, that she in turn went to the police after having discussed the matter with Ms. Sanchez. With respect to the notion that this had to be a gang killing, again, there's no evidence in the record beyond the assumption... It doesn't matter. There are plenty of people in this gang. Correct. But I would also point out that what in fact the gang expert said with respect to, if you will, the potential suspects, is the gang expert conscientiously declined the prosecutor's invitation that it could only have been OSP. The gang expert was fastidious in making sure the record was clear that there were... of which OSP was just one of five subsets. But this 7-11 was in the, as I understand it, was in the OSP turf, specific turf. Your Honor, with respect, Your Honor, if Your Honor were to look at the record at 0-0-3-4-9, 12-26, Officer Guerin was explicit that this was a Nortenio neighborhood. He continued to say that OSP was just one of five sets. He also testified that all five of the subgroups of the Nortenios were active at the time, that a number eight would be provocation to any of those groups. And Officer Guerin, to his credit, was clear about that. It was a Nortenio neighborhood, not simply OSP. And so, with respect, in my last comment, if you will, I think that there was sufficient doubt about the evidence. It was sufficiently problematic. There was poor eyewitness testimony. There was no physical evidence. That had the jury not been exposed to this inflammatory and, frankly, egregious summation by the prosecutor, I believe that there is a reasonable probability that they may not have convicted Mr. Zapata. And, therefore, his trial was fundamentally unfair. And the prosecutor's summation clearly injected an unfairness to the proceedings. Thank you, counsel. Thank you, Your Honor. The case is targeted, will be submitted, the court will stand and recess for today.
judges: REINHARDT, FISHER, BERZON